*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PHILLIP NICHOLS, JR.,

        Plaintiff-Appellee,

v

DIVERSIFIED ENGINEERING & PLASTICS, LLC,

        Defendant-Appellant.

UNPUBLISHED
July 21, 2026
1:55 PM

No. 374959
Jackson Circuit Court
LC No. 24-000634-CD

Before: M. J. KELLY, P.J., and PATEL and KOROBKIN, JJ.

PER CURIAM.

In this wrongful termination action, defendant appeals by leave granted the trial court's order granting summary disposition to plaintiff as to defendant's liability on plaintiff's claim under the Whistleblowers' Protection Act (WPA), MCL 15.369 *et seq.*, and denying summary disposition to defendant on the issue of damages.[1] We affirm the trial court's denial of defendant's motion for summary disposition, but reverse the trial court's grant of summary disposition to plaintiff on the issue of liability because a genuine issue of material fact exists regarding whether plaintiff was "about to" report defendant's safety violations to the Michigan Occupational Safety and Health Administration (MIOSHA).

## I. BACKGROUND

Plaintiff was hired by defendant as a tool room lead in August 2022. Within his first month of employment, plaintiff had safety concerns. For example, one of the injection molding machines had a broken limit switch so a crowbar had to be jammed into a hole to hold the limit switch down. Bypassing the safety feature meant that the safety door was open while the machine was running, which exposed any individuals in the area to potential injury. Other machines required operators to be on top of them without any guardrails or safety platforms to prevent the operators from

---

[1] *Nichols v Diversified Engineering & Plastics, LLC*, unpublished order of the Court of Appeals, entered October 12, 2025 (Docket No. 374959).

falling. And because there were no ladders on the machines, plaintiff explained that the operators "would have to climb the machine basically like a monkey to get to the top of it where we need to do our work . . . ." Additionally, multiple robot cages did not have a proper disconnect key, which meant the cages could be opened while the press was running. Another example plaintiff provided was one of the presses required crawling into an unmarked confined space underneath the press to change out tools. Plaintiff maintained that he feared for his physical safety and, at times, his life. Plaintiff's safety concerns caused him anxiety and impacted his attendance.

The employee handbook required employees to immediately report any unsafe practices or safety hazards to their supervisor, department manager, or the HR manager. Plaintiff reported his safety concerns to Bob Osterberg, defendant's operations manager, and four other leaders under Osterberg—John Signs, Brad Keehn, Aaron Davis, and Ryan Bailey. Osterberg and plaintiff had multiple conversations about plaintiff's safety concerns. Osterberg repeatedly indicated that defendant would address plaintiff's concerns. When the safety issues persisted, Osterberg explained that it was not in the budget but defendant would try to get a plan together and would get back to plaintiff. However, no one spoke to plaintiff about a plan.

Plaintiff knew that he could contact MIOSHA about his safety concerns. On several occasions plaintiff became frustrated that the safety concerns had not been addressed and told Osterberg that he would not have any problem contacting MIOSHA. Plaintiff searched for MIOSHA's number online and "had it ready." But Osterberg always talked plaintiff out of contacting MIOSHA by telling him that defendant would address his safety concerns. Because plaintiff believed Osterberg and thought he needed more time to address the issues, he did not contact MIOSHA. Plaintiff testified that no one threatened him with disciplinary action if he called MIOSHA.

In approximately October 2023, Osterberg left the company and Arden Stebbins became plaintiff's supervisor. Plaintiff reported safety concerns to Stebbins. Stebbins testified that plaintiff only reported issues regarding three machines, and those concerns were remedied. Plaintiff acknowledged that Stebbins addressed one of his safety concerns but testified that he reported other safety issues to Stebbins that were not addressed. Stebbins denied that plaintiff reported any other safety concerns to him.

In December 2023, Stebbins told plaintiff that he would like him to consider a position change to a full-time process technician. When Stebbins first discussed the position change with plaintiff, he told him that his hourly rate would remain the same. But Stebbins later learned from Anita Quillen, defendant's president and CEO, and LynnAnn Sell, the human resource manager, that plaintiff's hourly rate would decrease from $28 to $22 with the position change because of the pay scale for that position. Stebbins met with plaintiff and informed him of the decreased pay and the expectations for the position. At plaintiff's request, Stebbins gave him time to consider the change.

On January 9, 2024, Stebbins and plaintiff met to formalize the position change. Unbeknownst to Stebbins, plaintiff recorded the meeting on his phone.[2] After some discussion

---

[2] At the beginning of the meeting, Stebbins offered to record the meeting but plaintiff declined.

between Stebbins and plaintiff about the decreased pay, Sell joined the meeting at plaintiff's request. Although plaintiff was unhappy with the decreased pay, he agreed to the position change, which was to be effective January 12, 2024. Later in the meeting, plaintiff stated that their conversations led him to "understand and realize" that Osterberg and others had not brought his safety concerns to upper management. He explained that there were safety concerns that were not taken seriously at defendant's workplace:

> We have to climb on top of these presses, there's no guardrails, there's no ladders. . . . [W]e have to climb under these presses. . . . [M]y concern for safety has been there. I've reported it to people I'm supposed to. They are supposed to bring it to you guys, talk about it, build a plan and address it.

> * * *

> You guys have a 10:00 meeting every[]day. You're not talking about issues in the plant. So, like, if I report it to somebody—okay. And maybe I failed by not coming to you or coming to HR. But I'm reporting it to the leadership of the company, are they not coming to you either? It's apparent they're not.

> So that leaves me in a place do I need to go further and take better steps to get this addressed. I have no problem calling [MI]OSHA, none.

> * * *

> That's where I'm at with it.

Sell acknowledged plaintiff's safety concerns, informed him that there was a safety committee, noted that Osterberg had been "in charge of most of that" because Sell was unable to do it herself, and conceded that "it hasn't been done properly" since Osterberg left. Stebbins also acknowledged that "[t]he safety items just need to be heightened" and volunteered to be a safety coordinator or lead the safety meetings. Plaintiff told Stebbins and Sell that he would volunteer to be on a safety committee, stating, "I just want safety that's all." Stebbins assured plaintiff that he really wanted him as a full-time process technician. Plaintiff reiterated his agreement to the position change and stated he would complete the required training but noted that he believed the change was retaliation for his attendance issues. Plaintiff signed the required paperwork, the parties discussed the next steps, and the meeting ended amicably.

But after the meeting, Stebbins and Sell, with the approval of Quillen, decided to terminate plaintiff's employment. A few hours after their initial meeting with plaintiff January 9, 2024, Stebbins and Sell met with plaintiff to inform him that his employment was being terminated. Stebbins stated, "[I]t was deemed a threat about some safety concerns and what you may or may not do." He also explained that he and Sell had noticed that plaintiff had his phone in the earlier meeting and "could or could not have been recording" the meeting. Stebbins maintained that the employee handbook required an employee to obtain permission to record a meeting, and plaintiff had not obtained permission. Although plaintiff had recorded the first meeting, and was actively recording the second meeting, he denied the accusation, stating, "I haven't recorded a single thing." Stebbins clarified, "We said potentially recorded." Sell explained that they were not accusing plaintiff of recording. According to Stebbins, it was merely a suspicion. But Stebbins emphasized,

-3-

"the bigger thing is you made the verbal statements towards safety things and you had no qualms or guffs about calling [MI]OSHA on the company and we take that as a threat."

Regarding the accusation that he had made a threat, plaintiff explained:

> Right. So I speak on this as I said, hey, I'm willing to work with you guys and go through this as a team and fix the things that are wrong. But if it's not taken seriously I don't have an issue calling [MI]OSHA as any employee shouldn't. . . . [MI]OSHA isn't there as a threat, [MI]OSHA . . . is there to save us. Like keep us safe.

Stebbins responded, "We understand that, but we can't have somebody that's going to potentially threaten the company that way and potentially cause issues."

The termination notice indicated that the reasons for the termination were (1) that plaintiff, contrary to defendant's employee handbook, had brought his phone into a meeting without permission and (2) that plaintiff made verbal statements regarding safety issues that he had not brought to the attention of his "current manager" or human resources. Plaintiff signed the termination notice but indicated that he disagreed with defendant's description of the violation because he felt his termination was retaliation for "express[ing] concern about safety" and stating he "would call MIOSHA if not addressed and taken seriously."

Plaintiff testified that Stebbins had said something during the first meeting on January 9, 2024, that triggered his belief that his safety concerns did not matter. Plaintiff maintained that he did not threaten defendant "in any way by saying I would have no problem calling [MI]OSHA. You know, it was a simply, hey, if you're not going to take care of this, I don't have a problem calling [MI]OSHA, as nobody should." Sell testified that she considered plaintiff's statement about calling MIOSHA to be a threat. She believed that plaintiff had every intention of calling MIOSHA and that he was about to make a report to MIOSHA. Sell also conceded that plaintiff had legitimate safety concerns. Quinn testified that on the basis of the nature and context of the January 9, 2024 meeting with plaintiff, his statements about making a report to MIOSHA were viewed as a threat to defendant. Stebbins maintained that he thought plaintiff "was just making a vague statement" and said he was not sure whether plaintiff was about to make a report to MIOSHA. But he recalled plaintiff stating that it would not be the last that they heard from him. In an affidavit, plaintiff averred that he was ready to report safety concerns to MIOSHA on January 9, 2024. Once he was forced to accept the decreased pay, he was "no longer willing to accept the unsafe environment which is why I brought it up in the meeting and why I expressed my intent to report the issues to MIOSHA."

Sometime after his employment was terminated, plaintiff reported the safety concerns to MIOSHA. On January 22, 2024, MIOSHA visited defendant's facility. It subsequently issued three citations to defendant and possible fines of $3,600.

In March 2024, plaintiff commenced this action. On June 11, 2024, plaintiff received a settlement offer from defendant to reinstate his employment as a process technician. Plaintiff declined the offer. In August 2024, plaintiff enrolled in college to further his education because

he did not want to continue to work in manufacturing jobs. Before he enrolled in college, plaintiff had not been working. Plaintiff had applied for jobs but did not receive any job offers.

After discovery, plaintiff moved for partial summary disposition under MCR 2.116(C)(10) on the issue of liability. Plaintiff argued that there was no genuine issue of material fact that he engaged in a protected activity because he was about to report safety violations to MIOSHA when his employment was terminated. In addition to his own testimony regarding his intent to report the violations, plaintiff asserted that Stebbins and Sell both acknowledged that plaintiff was fired because he stated that he would have no issue calling MIOSHA. Plaintiff further argued that there was a direct causal connection between his protected activity and his discharge.

Defendant also moved for summary disposition under MCR 2.116(C)(10). Defendant argued that plaintiff could not prove by clear and convincing evidence that he was about to report a safety violation to MIOSHA when he was terminated. Defendant further argued that plaintiff was precluded from recovering any damages because he had failed to mitigate his damages by declining defendant's unconditional offer of reinstatement of his employment. Defendant argued that plaintiff's motion for summary disposition should be denied for the reasons stated in its motion. And in response to defendant's motion, plaintiff reiterated his argument that there was no genuine issue of material fact that he was about to report safety violations to MIOSHA when he was fired. Plaintiff also argued that the offer from defendant to reinstate his employment was not unconditional: it was a settlement offer that required plaintiff to execute a release and dismiss this case. Additionally, defendant had not presented any evidence that other employment was available to plaintiff.

Following a hearing, the trial court issued an opinion and order granting summary disposition to plaintiff on the issue of liability and denying summary disposition to defendant on the issue of damages. The trial court concluded that plaintiff proved by clear and convincing evidence that he engaged in "about to report" protected activity when he confronted Sell and Stebbins about his intent to report his safety concerns to MIOSHA if defendant did not address the safety violations. The trial court further concluded that plaintiff had established a causal connection between his discharge and the protected activity, and defendant had not shown a legitimate reason for plaintiff's discharge. Finally, the trial court concluded that there was a genuine issue of material fact whether plaintiff's rejection of the reinstatement offer or his decision to pursue a different career was reasonable. This appeal followed.

## II. STANDARDS OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). Summary disposition under MCR 2.116(C)(10) is warranted when "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *El-Khalil*, 504 Mich at 160 (cleaned up). When reviewing a motion for summary disposition under MCR 2.116(C)(10), a court must consider the evidence submitted by the parties in the light most favorable to the nonmoving party. *Id*. Summary disposition should be granted when, after reviewing the evidence in the light most favorable to the nonmoving party, there are no remaining

issues of material fact and the moving party is entitled to judgment as a matter of law. *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016).

We also review de novo the trial court's interpretation of the WPA, *Wurtz v Beecher Metro Dist*, 495 Mich 242, 249; 848 NW2d 121 (2014), and its determination that a plaintiff has established a prima facie case under the WPA, *Rivera v SVRC Indus, Inc*, 327 Mich App 446, 453; 934 NW2d 286 (2019), rev'd in part on other grounds 507 Mich 962 (2021).

## III. WHISTLEBLOWERS' PROTECTION ACT

Defendant argues that the trial court erred by granting summary disposition to plaintiff on the issue of liability by denying defendant's motion for summary disposition. We agree, in part.

The WPA prohibits employers from discharging an employee who reports or is about to report a legal violation, providing:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action. [MCL 15.362.]

The WPA was enacted to protect "employees who report a violation or suspected violation of state, local, or federal law." *Whitman v City of Burton*, 493 Mich 303, 312; 831 NW2d 223 (2013) (cleaned up). It "furthers this objective by removing barriers that may interfere with employee efforts to report those violations or suspected violations, thus establishing a cause of action for an employee who has suffered an adverse employment action for reporting or being about to report a violation or suspected violation of the law." *Id*.

A plaintiff may establish a prima facie case for violation of the WPA "by showing that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the defendant took an adverse employment action against the plaintiff, and (3) a causal connection exists between the protected activity and the adverse employment action." *Debano-Griffin v Lake Co*, 493 Mich 167, 175; 828 NW2d 634 (2013) (cleaned up). A plaintiff may rely on direct or indirect evidence to establish a prima facie violation of the WPA. *Id*. at 176. "Direct evidence" is " 'evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.' " *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001), quoting *Jacklyn v Schering-Plough Healthcare Products Sales Corp*, 176 F3d 921, 926 (CA 6, 1999). "Absent direct evidence of retaliation, a plaintiff must rely on indirect evidence of his or her employer's unlawful motivations to show that a causal link exists between the whistleblowing act and the employer's adverse employment action." *Debano-Griffin*, 493 Mich at 176. To prevail on indirect evidence, the plaintiff may present evidence "from which a factfinder could *infer* that the plaintiff was the victim of unlawful retaliation." *Id*. (cleaned up).

When a plaintiff relies on indirect evidence, the burden-shifting analysis of *McDonnell Douglas*[3] applies. *Hazle*, 464 Mich 462-463. If a plaintiff establishes a prima facie case, a presumption of retaliation arises and the burden shifts to the employer to rebut this presumption by offering "a legitimate reason for its action . . . ." *Debano-Griffin*, 493 Mich at 176. "To avoid summary disposition after the employer offers such a reason, the plaintiff must show that a reasonable fact-finder could still conclude that the plaintiff's protected activity was a motivating factor for the employer's adverse action, i.e., that the employer's articulated legitimate reason was a pretext disguising unlawful animus." *McNeill-Marks v MidMich Med Ctr-Gratiot*, 316 Mich App 1, 18; 891 NW2d 528 (2016). A plaintiff can establish that the employer's articulated reasons are pretexts "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Id*.

There is no dispute that plaintiff was terminated and thus suffered an adverse employment action. But defendant argues that plaintiff failed to establish that he engaged in protected activity. "Protected activity" includes "(1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation." *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 399; 572 NW2d 210 (1998). In this case, plaintiff argues that he was about to report a violation of the law to MIOSHA. Our Supreme Court has noted that the "about to report" prong is meant to "protect conscientious employees who intended to, but were discharged in retaliation before they could, report." *Shallal v Catholic Social Servs of Wayne Co*, 455 Mich 604, 612; 566 NW2d 571 (1997). The *Shallal* Court further noted, "*Webster*'s defines 'about' as 'on the verge of' when followed by an infinitive, such as 'to leave,' or in this case, 'to report.' " *Id*., quoting *Random House Webster's College Dictionary* (1995).

A plaintiff seeking protection under the "about to report" language of the WPA must ultimately "prove his intent by clear and convincing evidence." *Chandler*, 456 Mich at 400, citing MCL 15.363(4). However, the plaintiff's proof "need not consist of a concrete action to satisfy the 'about to' report element." *Shallal*, 455 Mich at 615. A plaintiff is not required to expressly state that he intended to report a violation of the law in the immediate future in order to establish that he was "about to" report such activity. *Id*. at 620 n 9. But "[a]n employer is entitled to objective notice of a report or a threat to report by the whistleblower." *Roulston v Tendercare (Mich), Inc*, 239 Mich App 270, 279; 608 NW2d 525 (2000).

In *Shallal*, the plaintiff worked as an adoption department supervisor for the defendant. *Shallal*, 455 Mich at 606. Allegations arose that Thomas Quinn, the defendant's president, was drinking on the job and misusing funds. *Id.* The plaintiff discussed with her supervisor, other staff members, and an honorary board member the need to report Quinn. *Id.* After the Department of Social Services (DSS) investigated and issued a report that was critical of the plaintiff and the defendant for violating several agency rules and regulations in the placement of a baby for adoption, plaintiff and Quinn had a meeting. *Id*. The discussion became heated, and the plaintiff told Quinn that she would report Quinn's abuse of alcohol and agency funds if he did not

---

[3] *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973).

"straighten up." *Id.* at 607-608, 614. Quinn decided to discharge the plaintiff, citing the DSS report. *Id.* at 608. The plaintiff sued the defendant for a violation of the WPA. *Id.* The trial court granted summary disposition to the defendant because there was no evidence that plaintiff was about to report a violation. *Id.* According to the trial court, any threats that the plaintiff made to report Quinn were contingent on his continued conduct. *Id.* This Court affirmed. *Id.* at 608-609.

The Supreme Court concluded that "[the] plaintiff's express threat to the wrongdoer that she would report him if he did not straighten up, especially coupled with her other actions, was more than ample to conclude that reasonable minds could find that she was 'about to report' a suspected violation of the law to the DSS." *Id*. at 621.[4] It explained:

> Plaintiff's conditional threat to her employer was credible evidence that she had finally decided that she was going to report him. Giving her employer the opportunity to correct his behavior does not in any way affect whether she had formed the requisite intent to report her supervisor. In fact, her threat furthered the public policy goal of the statute, which is to combat the corruption or criminally irresponsible behavior of employers. A plaintiff should not be required to say "magic words" in order to reap the protections of the statute. It should be sufficient that plaintiff actually threatened to report her employer. [*Id.* at 616.]

The Supreme Court disagreed with the dissent that the plaintiff's express threat to Quinn was insufficient because she did not actually report, stating, "Confronting a supervisor with a threat of a report serves to promote the public policy of whistleblower statutes. Certainly such a threat should demonstrate that the employee has an actual intent to report the violation." *Id.* at 619.

In this case, the trial court concluded that plaintiff "proved by clear and convincing evidence that he engaged in a protected activity when he threatened to report his safety concerns to MIOSHA." In reaching its conclusion, the trial court stated that the evidence was "on par with the evidence the [Supreme] Court considered in *Shallal* and aligns with the Court's reasoning that this is sufficient to establish that [Nichols] engaged in the 'about to report' protected activity." But the *Shallal* Court did not conclude that there was no genuine issue of material fact that the plaintiff had engaged in protected activity. Rather, the Supreme Court stated that its task was to determine whether the plaintiff met her "burden of establishing that a question of fact existed regarding whether she was 'about to' report Quinn's violations to a public body." *Id*. at 611. The Supreme Court ultimately concluded that the plaintiff's express threat to Quinn to report him if he did not straighten up, coupled with evidence of the plaintiff's other actions, was sufficient to allow reasonable minds to find that the plaintiff was about to report a suspected violation. *Id*. at 621. In other words, there was a genuine issue of material fact whether the plaintiff was about to report a violation.

We conclude that there is a genuine issue of material fact whether plaintiff was about to report safety violations to MIOSHA. At the first January 9, 2024 meeting, plaintiff stated, "So that leaves me in a place to say do I need to go further and take better steps to get this addressed.

---

[4] Those "other actions" included discussing with others the need to report Quinn and writing in a calendar that Quinn needed to be reported. *Shallal*, 455 Mich at 606, 613-614, 620 n 9.

I have no problem calling [MI]OSHA, none." At the second meeting, Stebbins told plaintiff that his statement was deemed a threat. Sell testified that she believed that plaintiff had every intention of calling MIOSHA and that he was about to make a report. Plaintiff testified that he had previously searched for MIOSHA's number and then, when he got frustrated that the safety issues were not addressed, informed Osterberg that he would have no problem calling MIOSHA. Although plaintiff never previously called MIOSHA, he stated in his affidavit that, once he was forced to accept the decreased pay with the position change, he was no longer willing to accept an unsafe environment. From this evidence, reasonable minds could find that plaintiff was about to report safety violations to MIOSHA.[5]

But reasonable minds could also find that plaintiff had not yet formed an intent or decided to report defendant to MIOSHA. Plaintiff did not expressly tell Stebbins and Sell that he would call MIOSHA. Rather, he stated that he had to question whether he needed to go further with his safety concerns and that he would have no problem calling MIOSHA. At the second January 9, 2024 meeting, upon hearing that his statements were deemed threats, plaintiff clarified that he had stated, "I'm willing to work with you guys and go through this as a team and fix the things that are wrong. But if it's not taken seriously I don't have an issue calling [MI]OSHA as any employee shouldn't." At his deposition, plaintiff testified that he had only stated that if defendant was not going to take care of his safety concerns, he would have no problem calling MIOSHA.

To avoid summary disposition, plaintiff was required to show that there is sufficient evidence to allow a jury to conclude by clear and convincing evidence that he was about to report the safety violations to MIOSHA. See *Shallal*, 455 Mich at 611; see also *Lynd v Adapt, Inc*, 200 Mich App 305, 306; 503 NW2d 766 (1993) (holding that the plaintiff had presented sufficient evidence to survive summary disposition). Plaintiff met his burden in this regard. But a genuine issue of material fact exists regarding whether plaintiff was "about to" report defendant's safety violations to MIOSHA. Accordingly, the trial court erred by granting summary disposition to plaintiff on liability.

The trial court also concluded that there is no genuine issue of material fact that there is a causal connection between the discharge and protected activity. Defendant fails to challenge this determination on appeal.[6] A party's failure to brief the merits of an issue constitutes abandonment.

---

[5] Defendant cites and relies on several unpublished opinions of this Court and the Sixth Circuit Court of Appeals. We are not bound by these opinions. See MCR 7.215(C)(1) ("An unpublished opinion is not precedentially binding under the rule of stare decisis."). See also *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004) (noting while state courts are bound by the decisions of the United States Supreme Court construing federal law, there is no similar obligation with respect to decisions of the lower federal courts). We also do not find these opinions persuasive. See *Albea*, 469 Mich at 607 (recognizing that lower federal court decisions may be persuasive); *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017) (recognizing that unpublished opinions of this Court may be considered for their instructive or persuasive value).

[6] We also note that defendant failed to raise any arguments regarding the causal connection in its motion for summary disposition or in its response to plaintiff's motion for partial summary

*Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999). Because defendant has abandoned the issue, we affirm the trial court's decision on the causal connection.[7]

For these reasons, we affirm the trial court's denial of defendant's motion for summary disposition and its determination that there is no genuine issue of material fact that there is a causal connection between the discharge and protected activity. But we reverse the trial court's grant of summary disposition to plaintiff on the issue of liability because there is a genuine issue of material fact regarding whether plaintiff was "about to" report defendant's safety violations to MIOSHA.

## IV. DAMAGES

Defendant asserts that there is no genuine issue of material fact that plaintiff failed to mitigate damages by rejecting defendant's unconditional offer of reinstatement. We disagree.

"Mitigation of damages is a legal doctrine that seeks to minimize the economic harm arising from wrongdoing." *Morris v Clawson Tank Co*, 459 Mich 256, 263; 587 NW2d 253 (1998). "[I]n order to mitigate damages, the plaintiff must make efforts that are reasonable under the circumstances to minimize the economic harm caused by the wrongdoer[.]" *Id*. at 265. In a wrongful discharge case such as here, a plaintiff must make reasonable efforts to find employment after the discharge. *Id*. at 264. If a plaintiff does not make reasonable efforts, he may not claim full back pay as damages. *Id*. But "the claimant's burden is not onerous, and does not require him to be successful in mitigation." *Rasheed v Chrysler Corp*, 445 Mich 109, 123; 517 NW2d 19 (1994) (cleaned up).

Although a plaintiff has a duty to mitigate damages, the defendant bears the burden of proof. "[T]he failure of a discharged employee to mitigate damages, whether by seeking other employment or by rejecting an unconditional reinstatement offer, is an affirmative defense to be established by the employer." *Id*. at 124. "[O]nce it is established that a reinstatement offer is unconditional, a rebuttable presumption arises that the rejection of the offer is unreasonable." *Id*. at 132. The plaintiff must then offer evidence of the reasonableness of the rejection. *Id*. "[T]he question whether an employee was reasonable in not seeking or accepting particular employment is one to be decided by the trier of fact." *Id*. at 124. As stated in *Morris*:

> Determining the "reasonableness" of a job search is a fact-laden inquiry requiring thorough evaluation of, for example, the earnestness of a plaintiff's motivation to find work and the circumstances and conditions surrounding his job

---

disposition. Accordingly, defendant waived this issue, and we need not address it. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 290, 294; 14 NW3d 472 (2023) (holding that failure to properly preserve an issue for appeal results in waiver of that issue).

[7] On appeal, defendant also fails to challenge the trial court's determination under the burden-shifting analysis that there is a reasonable inference that defendant terminated plaintiff because of his protected activity. But a presumption of retaliation will not arise until plaintiff establishes a prima facie case and then the burden will shift to defendant to rebut this presumption by offering "a legitimate reason for its action . . . ." *Debano-Griffin*, 493 Mich at 176.

search, as well as the results of it. The extent to which a plaintiff continues his job search once he has found employment is simply one of many factors in this fact-laden determination of reasonableness. Much of this inquiry depends upon determinations of credibility, which are far more within the competence of the trial court than within the competence of appellate judges reading dry records. [*Morris*, 459 Mich at 271.]

In this case, the trial court concluded, "Whether [plaintiff's] rejection of [defendant's] offer of reinstatement of employment or his choice to pursue a career in a different area of employment was reasonable is a question of fact." We agree. Plaintiff testified that he had applied for jobs but did not receive any job offers. Eight months after his termination, plaintiff enrolled in college to further his education. He maintained that he did not want to continue to work in manufacturing jobs. Plaintiff was not obligated to look for a job in the manufacturing industry. He was only obligated to make "reasonable [efforts] under the circumstances" to find a job and the job he searched for did not have to be "reasonably similar." *Id*. at 264-266, 269. And his efforts to mitigate his damages do not need to be successful or substantial, only reasonable. *Id*. at 264-265.

Defendant argues that plaintiff is precluded from recovery because he rejected defendant's offer of reinstatement. After plaintiff commenced this action, he received an offer from defendant to reinstate his employment as a process technician, which he declined. Defendant contends that this was an unconditional offer of reinstatement. But plaintiff maintains that the offer was presented as a settlement offer in an e-mail from defense counsel and conditioned upon plaintiff dismissing this case and executing a release. Quinn acknowledged that she did not reach out to plaintiff to provide the offer; it was conveyed in correspondence from defense counsel. When Quinn was asked to confirm that the offer was presented as a settlement offer by defense counsel and conditioned on plaintiff dismissing this action, Quinn responded, "I don't recall." Defendant did not present any other evidence of the reinstatement offer to the trial court. While "[a] reinstatement offer that is clear on its face may be construed as a matter of law by the courts," if it is "necessary to consider the parties' intent, the inquiry is a question of fact." *Rasheed*, 445 Mich at 127. Viewing the evidence in the light most favorable to plaintiff as the nonmoving party, the trial court did not err by concluding that the issue of mitigation of damages is a question of fact for the jury to decide.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Sima G. Patel
/s/ Daniel S. Korobkin

-11-